IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANDREAS L. MOORE, JR.,

                     Plaintiff,                            OPINION AND ORDER

    v.                                                         20-cv-918-wmc

MR. HOFFMAN, MS. HUNEKE,
MR. ASBERRY, and
NURSE BRIDGET,

                     Defendants.

      Appearing in this case on his own behalf, plaintiff Andreas L. Moore, Jr., alleges that he fell and fractured his wrist while an inmate at New Lisbon Correctional Institution. He further claims that defendants violated the U.S. Constitution and Wisconsin state law by failing to maintain the walkway causing his fall or providing adequate medical care after his injury. Defendants have now moved for summary judgement, arguing that Moore's claims lack merit. (Dkt. #33.) For the following reasons, the court will grant defendants' motion as to Moore's federal claims against Dr. Karl Hoffmann, Health Services Unit ("HSU") Manager Roslyn Huneke, and Nurse Bridget Rink, and having so ruled, will decline to exercise jurisdiction over his related state-law claims against these defendants, as well as New Lisbon Building and Grounds Supervisor Gary Ashberry.[1]

---

[1] For this reason, the court need not reach defendants' alternative assertions of qualified and discretionary immunity.

UNDISPUTED FACTS[2]

### A. Moore's Injury

Plaintiff Moore's claims are based on alleged events at New Lisbon in 2019, where each of the defendants were then working. On February 7, 2019, Moore slipped and fell while on an icy walkway in the fog and light snow. As a result of his fall, Moore injured his right wrist. Although Grounds Supervisor Asberry had assigned crews to keep the walkways clear of snow and ice that day, it would have been difficult to keep the walkways clear at all times in light of the weather conditions.

### B. Treatment for Moore's Injury

Nurse Rink assessed Moore's wrist on February 7 by testing his range of motion and checking for any pain or tenderness, bleeding, or bruising. Because of the pain and discomfort Moore was experiencing, Rink referred him to an advanced care provider, and Dr. Hoffmann saw Moore that afternoon. Concerned that Moore had fractured his wrist, Hoffmann then ordered a wrist x-ray be scheduled and immobilized his thumb with a spica Velcro splint to prevent further injury. Hoffmann also ordered Moore a prescription for calcium, along with vitamins C and D, to improve fracture healing and bone repair, and

---

[2] Unless otherwise indicated, the following facts are material and undisputed when viewed in a light most favorable to plaintiff, despite his failing to respond properly to defendants' proposed findings of fact as required by the court's summary judgment procedures. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."). Still, the court will not search the record for evidence; rather, to account for the fact that plaintiff is not represented by an attorney, the court has attempted to consider those facts he disputes where some credible evidence arguably supports it, or he could reasonably have personal knowledge of it.

restricted him from recreation and work. In addition, Moore had access to ibuprofen and Tylenol through the canteen, which he could keep with him in his cell.

On February 14, Moore submitted a health services request ("HSR") indicating that he was in pain and unable to sleep, as well as asking when he could get his x-rays. (Dkt. #40-1 at 5.) Nurse Rink reviewed Moore's HSR on February 15, and scheduled him for a nurse sick call that same day. A nondefendant, Nurse Frisk, then actually saw Moore and advised him to elevate his arm and to alternate cold and warm compresses on his wrist. (*Id.* at 7.) Nurse Frisk also noted that Moore's wrist x-ray had been rescheduled due to inclement weather and an institutional lockdown.

Unfortunately, Moore's x-rays were not taken until February 19, twelve days after his fall. Those x-rays revealed that he had fractured the scaphoid bone, one of the small bones in his wrist. When Dr. Hoffmann reviewed the x-rays the next day, February 20, he noted a "closed nondisplaced fracture of middle third of scaphoid of right wrist with delayed healing." (*Id.* at 2.) However, Hoffmann now attests that the notation regarding "delayed healing" was made in error, as there was no indication of delayed healing less than two weeks after Moore's original injury, but rather was the result of selecting the wrong "drop down" option in the computer software used for charting an office visit. (Dkt. #37 at ¶¶ 12-13.) Indeed, in his notes from a later visit with Moore, Hoffmann indicates that "[h]ealing is not delayed, but that was the popup." (Dkt. #40-1 at 22.)

Following the x-ray results, Dr. Hoffman applied a short arm thumb, spica cast to Moore to immobilize his wrist -- the typical treatment for Moore's type of fracture. Moore

3

was to wear that cast for six to twelve weeks, and Hoffmann referred him for cast checks and restricted him to light activity and to a lower bunk.

Dr. Hoffmann saw Moore again on March 13, 2019, for a cast check. He noted a little chaffing on Moore's forearm and loosening of the cast due to muscular atrophy, which was a predicted condition given that Moore was not using certain muscles. Moore told Dr. Hoffmann about throbbing pain that woke him up at night and that his stomach had been upset. Dr. Hoffmann ordered Moore an extra pillow to elevate his arm at night for comfort, and explained that vitamin C often causes an upset stomach. At Moore's cast change on March 22, Dr. Hoffmann removed Moore's cast and noted that Moore's skin was intact, dry, and without ulcers, reddening, bruising or irritation, and that the wrist was somewhat stiff as expected at that point.

On April 9, Moore submitted an HSR complaining of cast discomfort and pain. The next day, a nondefendant nurse evaluated the blood flow to his hand and noted no redness or irritation. To help relieve nighttime swelling, Moore received another pillow and ibuprofen. A week later, on April 16, Dr. Hoffmann also ordered Moore a higher dose of ibuprofen to address his pain and reduce swelling.

When x-rays taken on April 23 to assess how Moore's wrist was healing indicated no new fracture, dislocation, or abnormality, Dr. Hoffmann removed Moore's cast that same day, noting that while Moore was not tender at the fracture site, he was still experiencing tenderness over his forearm. To continue stabilizing Moore's wrist, Dr. Hoffmann also recast his wrist with another short arm thumb, spica cast. Dr. Hoffmann

noted no issues with the cast at a follow-up appointment on May 14, but did order naproxen to provide longer-lasting pain relief for Moore.

Two weeks later, on May 28, Dr. Hoffmann removed Moore's cast and ordered wrist x-rays that showed an incomplete healing of Moore's fracture. Because Moore's fracture had not completely healed after the typical 12 weeks, Dr. Hoffmann referred Moore to orthopedics for further evaluation. In response to Moore's HSR sent that same day requesting an MRI and to be seen by a specialist, Dr. Hoffmann noted that Moore had just had wrist x-rays taken and had been referred to orthopedics. On June 2, Moore submitted another HSR requesting disinfecting wipes for his cast, assistance carrying his meal tray, and different pain medication. Dr. Hoffmann changed Moore's pain medication from naproxen to meloxicam, a drug that can reduce pain, tenderness, swelling, stiffness, and inflammation.

Moore had a consultation with orthopedics a little less than two weeks later, on June 14, and was referred for a surgeon consult after it was confirmed that his fracture was not healing properly, and further that a cyst had developed in his wrist. He was evaluated by the University of Wisconsin Plastic Surgery Department on June 26, with x-rays taken that day indicating a failure of the healing of the bones that required surgery. The medical provider also recommended obtaining an MRI for surgical planning, but indicated that Moore's hand and arm no longer needed splinting or casting. In response to Moore's follow-up July 2 HSR, HSU Manager Huneke confirmed the specialist's request for an MRI and no need for a cast. (*Id.* at 39.) An MRI was then done on July 17, which confirmed a failure to heal and cyst formation. About a month later, on August 16, Moore was seen by

5

the University of Wisconsin Hand Clinic, where he discussed the MRI results, as well as his surgical *and* non-surgical options with another doctor, the timing of surgery being dependent on the availability of the surgeon and an operating room.

In August of 2019, Moore submitted five more HSRs reporting ongoing wrist pain, and requesting to be seen by a specialist and being given a low bunk restriction.  At that point, Moore had refillable orders for Tylenol and meloxicam for pain, was again scheduled to be seen at the Hand Clinic, and Dr. Hoffmann had ordered a low bunk restriction.  When Moore specifically requested Volteraren gel for his pain on August 28, Dr. Hoffmann ordered that too.  Dr. Hoffmann also ordered a higher dose of ibuprofen combined with acetaminophen and omeprazole in response to Moore's September 11 HSR concerning his ongoing wrist pain.  Although Dr. Hoffmann declined to order any stronger medications when Moore submitted an HSR noting that the gel was not effective, that was ostensibly because Moore's wrist surgery was by then upcoming, and Dr. Hoffmann's concerns about dulling the effectiveness of post-surgery pain management.  Even so, Dr. Hoffmann eventually relented and prescribed amitriptyline on October 22 in response to Moore's continuing complaints of pain.

Moore next met with Dr. Hoffmann on October 25 in preparation for his wrist surgery, at which time Dr. Hoffmann entered a prescription for Tramadol to control post-surgical pain.  Moore had surgery five days later and received a prescription for oxycodone from the surgeon.  However, the uses of that and similar narcotics are limited in an institutional environment like New Lisbon, because of the high risk of drug abuse and dealing among inmates, so rather than allow Moore the oxycodone, Dr. Hoffmann ordered

an extra pillow, ice, a sling to keep his arm immobilized, and continued amitriptyline with the Tramadol. Dr. Hoffmann renewed Tramadol and amitriptyline prescriptions the following month as well, explaining in response to Moore's November 4 and November 5 HSRs requesting oxycodone that he would not order it because it "is better at producing a high, without significant improvement in pain relief." (Dkt. #42-1 at 52-53.) On November 12, Moore submitted another HSR that asked HSU Manager Huneke for copies of his medical records and for the oxycodone that he was prescribed after surgery, but a nondefendant nurse reviewed that request and chose not refer it on to Huneke. Regardless, Huneke does not have the authority to override Dr. Hoffman's refusal to prescribe pain medication rather than oxycodone. Still, Moore continued to follow up with the hospital and with physical therapy regarding his post-surgical needs and issues.

OPINION

A party is entitled to summary judgment if the movant is able to show (1) there are no genuine dispute of material facts, and (2) judgment is appropriate as a matter of law. Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. If the moving party shows that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive the summary judgment motion, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252).

I. **Plaintiff's Eighth Amendment Claims**

On this basis, the court must grant summary judgment on plaintiff's federal claims against defendants Rink, Huneke and Hoffmann for failing to provide constitutionally adequate medical care. Prison officials may violate the Eighth Amendment right to medical care, but only if they act with "deliberate indifference" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). For purposes of summary judgment, the parties do not dispute that plaintiff was suffering a serious medical need. Therefore, the question at summary judgment is whether plaintiff has submitted enough evidence from which a reasonable jury could conclude that any of the defendants acted with "deliberate indifference" toward his serious medical need. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012).

"Deliberate indifference" means that the defendants were aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, although it may require something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). In cases like this one, in which a plaintiff contends that the treatment was inadequate, the relevant question is whether the medical provider's actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Moreover, courts must defer to treatment decisions of a medical professional unless

*no* minimally competent professional would have chosen the same course of treatment under the circumstances. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Accordingly, a "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* Even so, a medical provider may violate the Eighth Amendment if the provider prescribes a course of treatment without exercising medical judgment or one that the provider knows will be ineffective. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016). The court is to consider the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). For reasons discussed as to each defendant below, there is insufficient evidence for a reasonable jury to find the totality of plaintiff's medical care fails to meet this minimum standard.

### A. Nurse Rink

Beginning with Nurse Rink, plaintiff claims that she ignored his complaints of wrist pain when evaluating him on February 14, 2019. (Dkt. #1 at 5.) However, plaintiff is mistaken both with respect to the date and the nurse he saw. The record establishes that plaintiff was actually evaluated by a nondefendant, Nurse Frisk, on February 15, *not* Nurse Rink. (Dkt. #40-1 at 6-7.) Instead, on February 15, Nurse Rink only reviewed plaintiff's *HSR* dated February 14 about wrist pain and scheduled him for the sick call with Nurse *Frisk* that same day. In fairness, Nurse Rink did initially evaluate plaintiff's wrist on the day he fell, but then she immediately referred him to a non-defendant doctor, who

9

examined plaintiff that same afternoon. Since the only evidence is that Nurse Rink promptly and appropriately responded to plaintiff's medical needs, no trier of fact could find or even reasonably infer that she consciously disregarded his injury or pain, and she is entitled to summary judgment on his Eighth Amendment claim.

### B. HSU Manager Huneke

Plaintiff further alleges that HSU Manager Huneke disregarded his need for effective pain relief, including oxycodone. However, plaintiff cannot hold Huneke liable based simply on her supervisory role over others. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Rather, he must show that Huneke was personally involved in violating his rights. Here, the record establishes definitively that her only involvement in his care was minimal at best *and* appropriate. Indeed, Huneke's involvement is limited to responding the very next day to plaintiff's July 2 HSR asking about an MRI and whether he still needed a cast after it was removed at the hand clinic. As for this request, the evidence is that Huneke both followed up with the hand clinic and relayed to plaintiff promptly that: the MRI was being scheduled; he no longer needed splinting or a cast; and the clinic recommended no treatment changes until the MRI was completed. As a result, no reasonable jury could find or infer that Huneke's prompt steps to confirm plaintiff's treatment plan and provide him with the information constituted deliberate indifference to his medical needs.

There is also *no* evidence that Hueneke was involved in any decisions related to plaintiff's pain management. Although plaintiff submitted an HSR received by HSU on November 14, 2019, and directed to Huneke about not receiving oxycodone post-surgery,

the undisputed evidence that the triage nurse reviewing HSRs that day chose *not* to forward it to Huneke. Regardless, Huneke would not have had the authority to override an advanced care provider's pain medication prescriptions in any event. Because there is again *no* evidence from which a reasonable jury could find that Huneke recklessly disregarded plaintiff's pain needs, she is entitled to summary judgment on this claim.

### C. Dr. Hoffmann

Finally, plaintiff also claims that Dr. Hoffmann *knew* he required surgery on his wrist but delayed ordering it for months and failed to provide effective pain medication before and after surgery. However, the undisputed evidence of record shows that Dr. Hoffmann saw plaintiff regularly during his initial, pre-operative healing period, which was expected to take about 12 weeks, and that he immediately referred plaintiff for an orthopedic consult once the x-rays showed incomplete healing after 12 weeks. Dr. Hoffmann also followed the specialist's recommendations for an MRI and ultimately for surgery. Unfortunately, the timing of that surgery was dependent on the availability of the surgeon and an operating room. In opposition to this undisputed timeline, plaintiff opines that his earlier x-rays also indicated that his wrist was not healing properly and suggests that having ordered and received regular x-rays to monitor his healing is sufficient for a reasonable jury to find that Dr. Hoffmann was deliberately indifferent to his bone fracture. The evidence is to the contrary. Indeed, the exhibits plaintiff references only indicate that his wrist was fractured, and that he was being seen on a regular basis for that issue. There is almost nothing in this record to suggest, much less for a jury to find, that Dr. Hoffmann was wrong in his medical assessment that fractures take time to heal, nor that it was apparent from

the ongoing x-rays that plaintiff's fracture was not healing properly, as opposed to slowly, until Dr. Hoffmann made the referral to orthopedics. Indeed, the orthopedic and surgery experts noted no error or urgency in examining the same x-rays, not even with the benefit of an MRI. Certainly, at least absent some actual evidence that one could assess whether a break was healing properly in such a short time, plaintiff's lay opinion that he should have been referred to a specialist sooner, or even what any of his x-rays did or did not show, is insufficient to support a jury's finding that Dr. Hoffmann delayed plaintiff's wrist surgery with deliberate indifference to or in reckless disregard of his medical needs.[3]

Plaintiff also claims that Dr. Hoffmann knew he needed more effective pain relief, including oxycodone, but "failed to use the required degree of skill exercised by an average doctor" in prescribing alternative medications. (Dkt. #42 at 2.) However, once more, plaintiff offers no evidentiary support for his assertion, apart from his own lay opinion on the matter. As detailed above, Dr. Hoffmann *was* responsive to plaintiff's complaints of ongoing pain, having prescribed various pain medications at varied doses, including a gel pain reliever, along with other comfort measures such as extra pillows and ice, and later, a low bunk restriction. As for the post-surgery prescription for oxycodone, Dr. Hoffmann declined to order it because, in his medical judgment, he did not believe it would significantly improve plaintiff's pain, and posed a higher risk of abuse and heightened risks if introduced into a prison environment. Moreover, medical providers in an institutional

---

[3] For the reasons explained, Dr. Hoffmann's apparent error in selecting the "delayed healing" popup option when entering his progress notes after examining plaintiff is not enough by itself for this matter to go forward to trial, having first occurred just two weeks after the injury. (Dkt. #40-1 at 2.)

12

setting are due considerable deference in deciding what pain medications to prescribe to inmates and are not required to keep inmates pain-free. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations.")

That plaintiff disagreed with Dr. Hoffmann's decision to order Tramadol and amitriptyline, rather than a pain medication with a notorious history of being trafficked within prisons, is simply not enough for a reasonable jury to find his medical judgment "so far afield of accepted professional standards" as to support an inference of deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Indeed, "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Because plaintiff has not established that Dr. Hoffmann failed to exercise his medical judgment in treating his wrist and pain, this defendant is entitled to summary judgment on plaintiff's constitutional claim as well.

## II. Plaintiff's Remaining State-Law Claims

Having disposed of all of his federal claims on summary judgment, only plaintiff's state-law negligence claims against defendants Hoffmann, Huneke, Rink, and Building and Grounds Supervisor Gary Asberry remain. While the court may continue to exercise supplemental jurisdiction over these claims under 28 U.S.C. § 1367(a), courts are generally discouraged from doing so when the federal claims are disposed of before trial and the court

has not considered the merits of the state-law claims. *See Hagan v. Quinn*, 867 F.3d 816, 830 (7th Cir. 2017) (the presumption when all federal claims in a suit in federal court are dismissed before trial is that the court will relinquish federal jurisdiction over any supplemental state-law claims). Regardless, since exercising jurisdiction over the state-law claims does not appear to serve judicial efficiency, and neither party asks the court to retain jurisdiction over them if the federal claims are dismissed, plaintiff's state-law claims will be dismissed without prejudice to him pursuing them in state court, subject to any applicable statute of limitations.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #33) is GRANTED as to plaintiff's federal constitutional claims against defendants Dr. Hoffman, HSU Manager Huneke, and Nurse Bridget Rink, but DENIED as to plaintiff's state-law negligence claims.

2) The clerk of court is directed to enter judgment in favor of defendants on all federal claims and to DISMISS without prejudice all state-law claims.

Entered this 18th day of December 2023.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge